UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

| | |
|---|---|
| TORI MALONE,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>ST. JOSEPH COUNTY and<br>ST. JOSEPH COUNTY<br>HUMAN RESOURCES,<br><br>　　　　Defendants. | Civil Action No. 3:11-CV-249-JVB |

**OPINION AND ORDER**

Tori Malone alleges her former employer, St. Joseph County and St. Joseph County Human Resources ("the County"), committed race discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, by suspending her without pay and firing her two weeks later. The County has moved for summary judgment, and Malone has failed to respond with evidence that would allow a reasonable jury to infer that her race motivated these adverse employment actions. Her claim therefore fails; summary judgment is required.

　　A.　BACKGROUND

Malone, a black woman, began working for the County in August 2007 with the title "Human Resources Specialist." In early September 2008, she was promoted to "Human Resources Generalist," also known as "Specialist II," and given a memorandum last revised on January 7, 2008, that listed the duties of her new job. (*See* DE 1-1 at 6–9.) These involved supporting compliance with employment laws and regulations and assisting with unemployment and medical claims. (*Id.*)

Queenie Evans became Director of Human Resources in April 2009, which made her Malone's supervisor. According to Evans, Malone's responsibilities included "receiving and depositing St. Joseph County retirees' health insurance premium checks, posting the checks, reconciling accounts and assuring that the St. Joseph County employee insurance paperwork was completed correctly and submitted properly to the insurance company for processing." (Evans Aff., DE 20-1, ¶ 6.) Malone denies that depositing and posting checks for retirees' health-insurance premiums or reconciling the related accounts were part of her job. (Malone Aff., DE 22, ¶ 21.) When asked whether her Specialist II position "dealt more with processing of health claims and dealing with benefits issues with the employees," Malone explained:

> I didn't actually process the claims. I was more of a liaison between the employees and the insurance. I would review the paperwork, for example, during open enrollment time, to make sure the employees had completed all their paperwork correctly and then submit the information over to the insurance. The insurance company was the one that processed the paperwork.

(Malone Dep. 13–14, DE 20-1 at 37–38.)

Malone was subject to the County's Human Resources Policies and Benefits Manual, which conveyed under the heading "Conflict of Interest" that she was "expected to represent the County in a positive and ethical manner." (DE 1-1 at 12.) Her employment with the County was terminable at will. (Malone Dep. 46.)

As of the beginning of June 2009, the County had not notified Malone that she was deficient in performing any of the duties listed in the memorandum she received at the time of her promotion. Evans testifies, however, that from January 1, 2009, through the end of that June, Malone's pay was "'docked' at least thirty hours because she had taken more time off from work than was approved or allowed." (Evans Aff. ¶ 7.) Malone disagrees, maintaining that she "would work [her] scheduled hours" and that all time she took off from work was approved in advance. (Malone Dep. 21–22.)

Life took an unfortunate turn for Malone in the middle of 2009. During the night of Thursday, June 25, 2009, Malone "caught [her] husband with another woman." (Malone Dep. 27.) The record reveals few of the details, but Malone would later admit hitting her husband more than once with a golf club or umbrella. (*Id.* at 23–25; Evans Aff. ¶ 8.) The police eventually came to the scene, although by then Malone was no longer present. (Malone Dep. 25.) To Malone's knowledge, uncontested by the County, her husband was not seriously injured. (*Id.*)

The *South Bend Tribune* reported the incident on Saturday, June 27, 2009, without naming the persons involved. (DE 1-1 at 10.) According to the *Tribune*, the assailant attacked the second woman with a golf club, leaving the victim with "cuts and bruises and a black eye." (*Id.*) The *Tribune* article mentions no battery of the husband. (*See id.*) Malone learned of the newspaper story from a friend on that Saturday and decided to contact her supervisor, Queenie Evans, by phone the same day.

Malone told Evans "she had attacked her husband with either a golf club or an umbrella," (Evans Aff. ¶ 8) which prompted Evans to advise Malone that "she could be suspended effective immediately." (*Id.* ¶ 9.) Evans indicated she would speak with Andrew Kostielney, a member of the County Board of Commissioners, about the incident. (Malone Dep. 31.) A second phone call between Malone and Evans took place on Saturday, but it is unclear whether any new information was exchanged then. (*Id.* at 32; Evans Aff. ¶ 10.)

Evans discussed the news of Malone's attack with Kostielney, and decided to suspend her. (Evans Aff. ¶ 13) Kostielney concurred in this decision. (*Id.*)

On Monday, June 29, Evans and Malone met in person at the Department, and Evans notified Malone that she was henceforth suspended without pay, pending the Department's investigation. (Malone Dep. 32–34; Evans Aff. ¶¶ 12–13.) Evans advised that the reason for the suspension

3

was that Malone's attack on her husband violated Policies 503.1, 503.2, and 512.1 of the County Human Resources Policies and Benefits Manual. (Evans Aff. ¶ 13.) Evans then read the beginning of Policy 503.1 to Malone. (*Id.*) This text obligated Malone "to represent the County in a positive and ethical manner." (DE 1-1 at 12; Evans Aff. ¶ 13.) Evans said Malone's attack ran afoul of the Department's Policies because it was an instance of failing to represent the County in a positive and ethical manner and of "allegedly violating the law." (Evans Aff. ¶ 13.) Malone then requested a copy of the Policies she was accused of contravening, and Evans delivered some of them, (Malone Dep. 36) although possibly not Policy 512.1, which, in any event, no party has relied upon. Also on Monday, June 29, 2009, Evans handed Malone a short memorandum (DE 1-1 at 11) stating that Malone was suspended, as of the same day, pending an investigation.

Evans proceeded to assign Malone's duties to other County employees. (Evans Aff. ¶ 17.) Those employees made Evans aware that Malone had failed to "reconcile accounts" and to correctly complete and submit "paperwork" to an insurer. (*Id.* ¶ 18.) Malone's replacements also told Evans that Malone had not promptly deposited or "posted" checks for retirees' health-insurance premiums. (*Id.*) According to Evans, Malone's replacements "had to either revise or complete significant portions of [Malone's] work." (*Id.*) Malone denies this. (Malone Aff. ¶ 25.)

Evans explains she decided to fire Malone because the reports from Malone's replacements made it apparent that she had not been meeting the County's expectations. (Evans Aff. ¶ 19.) Evans discussed also the termination decision with Kostielney, and again he agreed. (*Id.*) Evans communicated the termination decision to Malone by a letter dated July 14, 2009. (*Id.*)

Malone perceived her termination as race discrimination, and took her case to the South Bend Human Rights Commission ("SBHRC") on July 16, 2009. Malone charged that she was

4

"aware of White employees who violated the company policy and who were placed on suspension for up to a year prior to termination." (SBHRC Charge of Discrimination, DE 1-1 at 2.) She alleged further that another "White employee [had] violated the [County's] policy and was suspended but not terminated." (*Id.*) Malone eventually received a right-to-sue letter from the Equal Employment Opportunity Commission and timely initiated this lawsuit. The County has moved for summary judgment, and separately to strike part or all of Malone's affidavit, which she submitted in response to the summary-judgment motion.

Malone's contention is that her suspension and termination each constituted adverse employment actions motivated by her race. She acknowledges that she must prove discriminatory intent, and relies exclusively on the indirect method in attempting to show she has the evidence to do so. (Resp. Mot. Summ. 9.) Malone argues a jury could reasonably infer discriminatory intent from the County's more favorable treatment of similarly situated white employees; in particular, Susan Hancock and Kevin Klaybor.

Hancock is a white woman. (Evans Aff. ¶ 31.) Evans explains Hancock began working for the County in 2003 as Director of Community Corrections. (*Id.* ¶¶ 30–31.) Her employment was terminable only for cause, by majority vote of the County's Community Corrections Program Advisory Board, subject to the approval of the County Board of Commissioners. (*Id.* ¶ 32.) On June 23, 2008, Hancock and her husband were charged with receiving stolen property, which, according to Evans, is a class-D felony under Indiana law. (*Id.* ¶ 36.) The County suspended Hancock's employment without pay on the same day. (*Id.* ¶ 37.)

On May 29, 2009, a jury acquitted Hancock of "all criminal charges" (*id.* ¶ 38), and the Community Corrections Advisory Board voted to retain her as Director about one month later.

(*Id.* ¶ 39.) On July 14, 2009, however, the County Board of Commissioners voted to terminate Hancock because of a loss of "confidence in her ability to perform her job functions." (*Id.* ¶ 40.)

Klaybor is a white man. In 2008, he was the County's Chief Deputy Assessor, working directly under Assesssor David Weslowski, who had the authority to fire him. (*Id.* ¶ 21–22.) That year, on a date unspecified by the parties, Klaybor was charged by information with the battery of a woman. The battery was apparently alleged to have occurred at a time and place outside of Klaybor's County employment. (*Id.* ¶ 23.) On or about October 21, 2008, Weslowski suspended Klaybor's employment without pay. (*Id.* ¶ 24.) For reasons unstated in the record here, Weslowski reinstated Klaybor to his position as Chief Deputy Assessor, on May 11, 2009. (*Id.* ¶ 26.) Klaybor was acquitted by a jury of the criminal charges against him on August 28, 2009. (*Id.* ¶ 27.)

Malone neither disputes nor adds to Evans's testimony regarding the County's treatment of Hancock and Klaybor.

### B. LAW

A motion for summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The substantive law governing each cause of action determines materiality. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of fact is "genuine" if the issue could reasonably be decided in favor of the nonmoving party. *Id.* Courts considering summary judgment must view the evidence "in the light most favorable to the party opposing the motion," *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003), which means drawing all reasonable inferences against summary judgment. *See Liberty Lobby*, 477 U.S. at 250–52.

Because only the indirect method of proving racially disparate treatment in violation of Title VII is at issue here,[1] the Court derives the material facts from the progeny of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Liberty Lobby*, 477 U.S. at 248 (substantive law determines which facts are material); *Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012) (attributing the indirect method of proof to "a line of cases beginning with *McDonnell Douglas*"). The indirect method is a burden-shifting framework. "Under the indirect method, the plaintiff carries 'the initial burden . . . of establishing a prima facie case of . . . discrimination.'" *Coleman*, 667 F.3d at 845 (second omission in original) (quoting *McDonnell Douglas*, 411 U.S. at 802). To do so, she needs evidence that: (1) she is a member of a protected class, (2) her performance met her employer's legitimate expectations, (3) she suffered an adverse employment action, and (4) her employer treated a similarly situated individual outside of the protected class more favorably than it treated her. *Id.* (citing *Burks v. Wisc. Dep't of Transp.*, 464 F.3d 744, 750–51 (7th Cir. 2006)). Where a "'plaintiff produces evidence sufficient to raise an inference that an employer applied its legitimate expectations in a disparate manner,'" however, "'the second and fourth prongs merge.'" *Elkhatib v. Dunkin Donuts, Inc.*, 493 F.3d 827, 830–31 (7th Cir. 2007) (quoting *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 329 (7th Cir 2002)).

Upon establishing this prima facie case, the plaintiff triggers a presumption of discrimination. *Coleman*, 667 F.3d at 845. "'The burden must then shift to the employer to articulate some legitimate, nondiscriminatory reason' for its action." *Id.* (quoting *McDonnell Douglas*, 411 U.S. at 802). If the employer does so, then "the burden shifts back to the plaintiff, who must present evidence that the stated reason is a 'pretext,' which in turn permits an inference of unlawful discrimination." *Id.* (quoting *McDonnell Douglas*, 411 U.S. at 804). The "plaintiff may

---

[1] "Malone acknowledges that her presentation of [genuine] issues [precluding summary judgment] is to be made against the backdrop of the requirements of the model derived from McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)." (Resp. Mot. Summ. J. 9.)

demonstrate pretext by providing evidence that a similarly situated employee outside her protected class received more favorable treatment." *Id.* at 841.

### C. ANALYSIS

The County does not dispute that Malone belongs to a protected class or that her suspension without pay and termination constituted adverse employment actions. Instead, the County's motion for summary judgment attacks Malone's showings that she was meeting its legitimate expectations and that it treated a similarly situated non-black employee better than it treated her.

The Court agrees Malone has failed to identify a non-black employee whom the County treated more favorably in a comparable situation. Though this inquiry is flexible and "'usually'" one of fact for trial, *see id.* at 846–47 (quoting *Srail v. Vill. of Lisle*, 588 F.3d 940, 945 (7th Cir. 2009)), "a court may properly grant summary judgment where it is clear that no reasonable jury could find that the similarly situated requirement has been met." *McDonald v. Vill. of Winnetka*, 371 F.3d 992, 1002 (7th Cir. 2004). The plaintiff needs at least one comparator whose circumstances could reasonably be viewed as similar to the plaintiff's. *See Coleman*, 667 F.3d at 845–47. Thus, "[i]n the usual case a plaintiff must at least show that the comparators (1) 'dealt with the same supervisor,' (2) 'were subject to the same standards,' and (3) 'engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.'" *Id.* at 847 (quoting *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 690 (7th Cir. 2008)).

The *Coleman v. Donahoe* opinion helps focus the first of these issues:

> While we have sometimes phrased the question ambiguously as whether the comparators dealt with the same supervisor, the real question is whether they were treated more favorably by the same decisionmaker. This point follows logically from the cause of action itself, which requires proof that the

> decisionmaker has acted for a prohibited reason. Under Title VII, a decisionmaker is the person responsible for the contested decision.

*Id.* at 848 (citations and quotation marks omitted). Indeed, the Seventh Circuit "generally requires a plaintiff to demonstrate at a minimum that a comparator was treated more favorably by the same decision-maker who fired the plaintiff." *Id.* (citing *Ellis v. United Parcel Serv.*, 523 F.3d 823, 826 (7th Cir. 2008)). *Little v. Illinois Department of Revenue*, 369 F.3d 1007, 1012 (7th Cir. 2004), which the *Coleman* opinion cites, states this even more strongly: "A similarly-situated employee must have been disciplined, or not, by the same decisionmaker who imposed an adverse employment action on the plaintiff." According to *Little*, the treatment of ostensible comparators, if directed by a different decisionmaker, "sheds no light on" the motivation behind the adverse employment action against the plaintiff. *Id.*

In this case the central question for the jury would be whether Evans, with Kostielney's concurrence, suspended and fired Malone because of her race. Evidence of what other decisionmakers did contributes little or nothing to that inquiry. *See Coleman*, 667 F.3d at 848; *Little*, 369 F.3d at 1012. And that's all Malone has. It was David Weslowski, not Queenie Evans, who decided to suspend, and later reinstate, Kevin Klaybor. Likewise, Malone submits no evidence that Evans played any role in the employment decisions the County made with regard to Susan Hancock. Malone's failure to identify a common decisionmaker for any potential comparator leaves a gaping hole in prima facie case.

Although *Coleman* arguably suggests the absence of a common decisionmaker may not be fatal under some (unidentified) special circumstances, Malone's prima facie showing is weak in other respects, as well. It is therefore doubtful the Seventh Circuit would allow her to blaze a new trail as an indirect-method plaintiff with no same-decisionmaker comparator.

Aside from the fact that Evans had nothing to do with what happened to Hancock, Hancock's employment was terminable only for cause, and she occupied a more senior position than Malone did, within an entirely different department of the County. Moreover, it is far from clear Hancock received more favorable treatment than Malone did. Both, of course, were suspended and then terminated. Malone focuses on the fact that Hancock's suspension lasted longer (Resp. Mot. Summ. J. 17), but this was not more favorable to Hancock, because Hancock's suspension was also without pay.

The absence of a common decisionmaker is not the only meaningful distinguishing circumstance for Klaybor, either. Malone relies on Klaybor because "'his suspension was followed by a reinstatement to his prior employment position, after the lapse of just a few months.'" (Resp. Mot. Summ. J. 18 (quoting Malone Aff. ¶ 17).) But it is undisputed that between the time of Malone's suspension and her termination, Evans received reports that arguably suggested Malone had not been doing her job completely. Malone submits no evidence that Weslowski had any reason to doubt the quality of Klaybor's work. Thus, Klaybor's record at the time the County reinstated him was materially dissimilar to Malone's record when the County terminated her.[2] Klaybor's job as deputy assessor was also very different from Malone's role within the Department of Human Resources. Weslowski's suspension and reinstatement of Klaybor do not give rise to a reasonable inference that race motivated Evans to suspend or terminate Malone.

For these reasons, Malone's evidence stops short of a prima facie case, even when viewed in the light most favorable to her. The County, of course, has also come forward with its own

---

[2] Malone's case would not improve if Evans terminated her on the basis of a false impression of Malone's job duties. After all, Malone's claim is for race discrimination. "An employer's mistaken belief that the plaintiff's conduct merited termination is not unlawful, so long as the belief was honestly held." *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 696 (7th Cir. 2006) (citing *Wade v. Lerner N.Y., Inc.*, 243 F.3d 319, 323 (7th Cir. 2001) (employer's honest but mistaken belief that plaintiff had been late for work defeated claim of age discrimination)).

evidence that nondiscriminatory reasons motivated the suspension and termination. Evans affirms by affidavit first that the County suspended Malone because Evans viewed the domestic incident as a violation of a Human Resources Policy, and second that the County terminated Malone "because it became apparent to [Evans] that [Malone] was not satisfying the St. Joseph County Human Resources Department's job expectations." (Evans Aff. ¶ 19.) Malone's responsive claim of pretext is, in substance, identical to her prima facie argument:

> In summary, it is likely that the prospective factfinders' [*sic*] will not believe the reasons put forward by St. Joseph County for termination of Malone's employment. That same disbelief, when coupled with the elements of the *prima facie* case . . . , will suffice to show . . . discrimination against Malone upon the prohibited basis of his [*sic*] race.

(Resp. Mot. Summ. J. 19.) This could have worked if Malone had had a prima facie case to begin with. After all, under *Coleman*, 667 F.3d at 841, a plaintiff can use evidence that a similarly situated employee received better treatment not only as part of the prima facie case, but also to show pretext. As the Court has already explained, however, Malone identified no suitable comparator. Thus, no reasonable jury could find in her favor.

Because the Court has decided to grant summary judgment even without striking any part of Malone's affidavit, the County's motion to strike it in part or in whole is moot.

### D. CONCLUSION

The Court—

- **GRANTS** Defendants' motion for summary judgment (DE 18);
- **DENIES** the motion to strike parts or all of Malone's affidavit (DE 23); and
- **VACATES** the trial and final pretrial conference dates.

**SO ORDERED** on June 13, 2013.

                                                 s/ Joseph S. Van Bokkelen
                                                JOSEPH S. VAN BOKKELEN
                                                UNITED STATES DISTRICT JUDGE